UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES EDWARD STRAWN,<br><br>　　　　　　Petitioner,<br><br>　　v.<br><br>S. HATTON,<br><br>　　　　　　Respondent. | No. 2:17-cv-02599 JAM KJN<br><br>FINDINGS & RECOMMENDATIONS |

I. Introduction

Petitioner is a state prisoner, proceeding without counsel, with an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner challenges his 2014 conviction for corporal injury to a cohabitant, torture, and being a felon in possession of a firearm. Petitioner was sentenced to life in prison with the possibility of parole plus eight months. Petitioner claims that there is insufficient evidence to support his conviction for the crime of torture. After careful review of the record, this court concludes that the petition should be denied.

II. Procedural History

On August 20, 2014, a jury found petitioner guilty of corporal injury to a cohabitant (Cal. Pen. Code, § 273.5(a)), torture (Cal. Pen. Code, § 206), and being a felon in possession of a firearm (Cal. Pen. Code, § 29800(a)); the jury also found true a great bodily injury allegation

////

1

(Cal. Pen. Code, § 12022.7). (CT 128, 131, 134-35; RT 441-43.)[1]  In proceedings held October 31 and November 10, 2014, petitioner was sentenced to a determinate term of eight months for possession of a firearm by a felon, and an indeterminate term of life in prison with the possibility of parole for the crime of torture.  An eight-year term was also imposed for the corporal injury count and related great bodily injury allegation, yet that term was stayed pursuant to California Penal Code section 654. (CT 207-14; RT 448-67.)

Petitioner appealed the conviction to the California Court of Appeal, Third Appellate District.  (LD 2-4.)  The Court of Appeal affirmed the conviction on August 22, 2017.  (LD 1.)

Petitioner filed a petition for review in the California Supreme Court (LD 5), which was denied on October 25, 2017.  (LD 6.)

Petitioner filed the instant petition on November 21, 2017.  (ECF No. 1.)

III. Facts[2]

In its unpublished memorandum and opinion affirming petitioner's judgment of conviction on appeal, the California Court of Appeal for the Third Appellate District provided the following factual summary:

> 1. Prosecution Case
>
> a. R.J.'s Testimony
>
> In May 2014, the victim, R.J., lived with defendant in two "fifth-wheel" trailers in the town of Oak Run.  R.J. and defendant had been a couple "[o]ff and on" for approximately seven years, and had lived together for the past year. Defendant possessed several guns, including a sawed-off shotgun.
>
> Around 11:30 p.m. on May 11, 2014 (Mother's Day), defendant got into an argument with R.J. after she attempted to smoke marijuana without his permission. Defendant yelled at R.J. and repeatedly struck her in the head, causing her to fall down multiple times. Defendant called R.J. a "cunt" and accused her of "[t]rying to go over

---

[1] "CT" refers to the Clerk's Transcript on Appeal; "RT" refers to the Reporter's Transcript on Appeal; "LD" refers to the Lodged Documents received March 16, 2018; "ECF" refers to documents filed in the court's electronic case management system.

[2] The facts are taken from the opinion of the California Court of Appeal for the Third Appellate District in People v. Strawn, No. C077917 (8/22/17), a copy of which was lodged by respondent as Lodged Document No. 1.

2

[his] head." According to R.J., the assault lasted for more than two hours. Although she lost track of time, R.J. indicated that defendant was still assaulting her when the sun came up.

During the assault, defendant made R.J. put her hands down so she could not defend herself and then he hit and head-butted her in the face. When R.J. was knocked down, defendant kicked her. R.J. begged defendant to stop but he refused to do so. As he was assaulting her, defendant told R.J.: "Happy fucking Mother's Day, cunt!" At one point, defendant gave her a drink of water and told her, "[Y]ou know I love you, right?" Defendant then started hitting R.J. again and knocking her down.

When R.J. grabbed a kitchen knife that had fallen onto the floor, defendant said, "You going to fucking stab me, bitch?" After R.J. indicated that she was not going to do so, defendant took the knife from her, threw it aside, and began head-butting and hitting her again. R.J. explained that each time she was knocked down, defendant would kick her and demand she "[g]et up [and] face [him] like a man."

After hours of being hit, kicked, and head-butted, R.J. was swollen and had trouble hearing. She was bleeding and had been knocked unconscious once or twice. R.J. noted that defendant was also bleeding from a cut on his forehead. R.J. estimated that defendant head-butted her around seven times and kicked her at least 10 to 15 times while she was on the ground begging him to stop. In response to her pleas to stop, defendant said: "I may go away for a long time. You're going to be ruler of the roost. I have a problem hitting women."

When defendant was done assaulting R.J., he told her that she needed to get cleaned up. He ordered her to take a shower and then tore the bathroom door off its hinges so he could watch her shower. After she was finished showering, defendant threw cups of cold water on her as she stood in front of him shivering. In response to her request, defendant allowed R.J. to go to the other trailer and get warm. While they were inside the trailer, defendant claimed he saw someone outside. He then screamed, "Get out of here," and fired two shots from his sawed-off shotgun out the trailer door. Thereafter, R.J. fell asleep. When she woke up, defendant was placing her hand on his erect penis. R.J., who was too afraid to say no to defendant, had sexual intercourse with him.

R.J. explained that at this point her body felt numb. Her face was so swollen she could see her cheeks and eyelids. When defendant ordered her to look in the mirror, R.J. said her face was unrecognizable. She described it as looking like "Freddy Krueger." Her entire face was swollen and bruised, and her head felt like it was covered with "Play–Doh." R.J.'s neck, arm, and ribs were also swollen and bruised. Defendant told R.J., "That looks like a woman that just learned her lesson." He also told her, "I wouldn't let anyone see you if I were you," and "I wouldn't go anywhere if I were you." He said, "If anybody sees you, they're going to call the cops."

3

When defendant left the property around 9:00 or 10:00 a.m., R.J. got into her car and went to a friend's house. The police were called but R.J. did not wait for them to arrive because she wanted to "protect" defendant and was afraid. The next day, R.J. went to her brother's house. She called the police the following day (i.e., May 14, 2014).

R.J. explained that she has residual injuries from the assault. She suffers from headaches and experiences dizzy spells, which did not occur prior to the assault. She also noted that she has a loose tooth from the assault.

### b. Deputy Greg Ketel's Testimony

On May 14, 2014, Shasta County Sheriff's Deputy Greg Ketel responded to R.J.'s report of domestic violence. He interviewed R.J. and photographed her injuries. Deputy Ketel observed bruising, redness and scratches on R.J.'s face, a laceration on her forehead, bruises on her arms, large bruises near her shoulders, and redness and scratches on her neck. R.J. told Deputy Ketel that defendant had head-butted her, and that she lost consciousness more than two times. She explained that defendant used his palm, rather than his fist, to strike her.

Despite her injuries, R.J. declined to be transported to Redding for medical treatment. She also indicated that she did not want to be taken to Redding to obtain a restraining order against defendant.

When Deputy Ketel interviewed defendant, he explained that he and R.J. got into an argument because R.J. had taken some marijuana that belonged to a customer of his. He did not indicate to Deputy Ketel that there had been a "mutual fight" or that he felt "attacked" by R.J. Instead, defendant admitted that he got upset and slapped R.J. "around a little bit." Defendant also admitted that R.J. might have some injuries to her face around her eyes and nose. However, he denied that he punched, kicked, or shoved R.J. He also claimed that he did not have any injuries, and that the laceration on his forehead was caused when he hit his head on a car he was working on. Deputy Ketel did not observe any injuries on defendant's hands.

While defendant was incarcerated in county jail, his telephone calls were monitored and recorded. Portions of the calls were played for the jury. During the calls, defendant made several admissions, including that he "slapped [R.J.] around a little bit," "beat on" her "a little bit," and "straight[ened] her out" for stealing from him. He indicated that R.J. got what was coming to her, and that she needed a whole lot more. He said that R.J. needed to be "stomp[ed] on," hung, and given a "red headache."[] He also indicated that he was "going after her ass" as soon as he got out of jail. In addition, defendant made numerous derogatory remarks about R.J., and attempted to persuade his grandfather to conceal the fact that he illegally possessed firearms.

### c. Domestic Violence Propensity Evidence

At trial, the court took judicial notice of defendant's prior convictions

for domestic violence against two of his former girlfriends: (1) a 2002 misdemeanor conviction for infliction of corporal injury upon a cohabitant (§ 273.5, subd. (a)); and (2) a 2004 felony conviction for infliction of corporal injury upon a cohabitant (§ 273.5, subd. (a)). The prosecutor did not call a witness to testify about the details of the 2002 conviction. Two Shasta County Deputy Sheriffs, Pat Lanham and Evan Armstrong, testified about the 2004 conviction.

Deputy Lanham testified that he responded to a report of abuse involving defendant and a cohabitant named "H." When he arrived at the hospital, H. explained the details of the assault. Deputy Lanham observed and photographed H.'s injuries, which included bruising and swelling on her forehead and other areas of her face, neck, and back, as well as scratches and other marks on her back and legs. Deputy Lanham noted that H. had a bruise in the shape of a boot or shoe print on her back. According to Deputy Lanham, H.'s injuries corroborated the details of the assault she had described to him.

Deputy Armstrong testified that he and three other officers went to the property where defendant was living and arrested him. At the property, the officers found two rifles inside his truck. When interviewed, defendant admitted he had argued with H. He claimed that she punched him in the forehead, and that he slapped her in the face one time. He said that H. then got into her car and left with her children. When defendant was asked about an injury to his foot, he claimed that he had kicked a television. Defendant, however, had no explanation for the injuries on the knuckles of his right hand.

### d. R.J.'s Recall Testimony

After Deputy Lanham testified, R.J. was recalled to testify about defendant's prior acts of abuse. R.J. testified that defendant hit her for the first time when they had been together for less than six months. She said that he "smacked" her in the mouth "[l]ike a slap down." A few months later, R.J. said that defendant head-butted her, causing a big knot on her forehead. On another occasion, defendant became enraged and accused her of infidelity. As she attempted to drive away, defendant threw a large piece of wood through her window, causing a large bruise on her arm. In another incident, defendant became angry at R.J. and chased her. When she attempted to drive away, he fired shots at her with his rifle. On yet another occasion, R.J. said defendant "clocked [her] left and right" on each side of her head. R.J. also recounted an incident in which defendant hit her and knocked her to the ground. She explained that he kicked her while she was on the ground and then told her to get back up. During the incident, defendant said that he was "just toying with [her]." Finally, in an incident stemming from an argument about a computer keyboard, defendant choked R.J. so hard she could not breathe. He also injured her ribs when he took her to the ground and landed on top on her.

R.J. explained that she would leave defendant after he abused her, but would eventually come back because she loved him. She further explained that she never called the police because she "wanted the good Jimmy to come out."

5

B. Defense Case

Defendant testified on his own behalf. He admitted to having numerous arguments with R.J. He also admitted he had prior convictions for domestic violence in 2002 and 2004.

Defendant claimed that R.J. yelled at him a lot and had assaulted him three times in the past, including on the evening of May 11, 2014. He explained that the argument on May 11, 2014 was about R.J. taking marijuana without his permission. He was extremely upset about R.J.'s behavior and demanded she move out. Defendant admitted that he yelled at R.J. and slapped her. According to defendant, R.J. then came after him with a butcher knife. He explained that he took the knife away from R.J., slapped her "rather hard" in the face three or four times, and then went outside to cool down. When they talked later that evening, R.J. apologized and begged him to let her stay. He said that they slept together that night and had consensual intercourse in the morning. He also said that R.J. agreed to leave the property but was very angry.

Defendant denied or did not remember, among other things, hitting R.J. for an extended period of time, kicking her, knocking her to the floor and beating on her, head-butting her, hitting her with his fist, forcing her to take a shower, or shooting his shotgun. He also claimed he did not observe that she had been knocked out. He also denied that he made nasty comments about R.J.'s looks or committed any of the prior incidents of abuse recounted by R.J. Defendant said that R.J. was a "dirty bitch," a "thief," and a "liar."

On cross-examination, defendant conceded that he had a problem hitting women. He admitted that he had previously hit two former girlfriends and was convicted of felony corporal injury in 2004. He also admitted that he never mentioned to Deputy Ketel that R.J. had attempted to stab him with a butcher knife, and that he lost his temper and struck R.J. out of "revenge" because she was "ripping [him] off." He explained that he was very angry and "[t]ired of getting ripped off." In addition, defendant acknowledged that he said R.J. needs "to be stomped on," and that he enjoyed calling her names. He also acknowledged that he attempted to persuade his grandfather to lie about the guns found by the police because he knew he was not allowed to possess them.

(People v. Strawn, LD 1 at 2-8 [fn. omitted].)

IV. Standards for a Writ of Habeas Corpus

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. § 2254(a). A federal writ is not available for alleged error in the interpretation or application of state law. See Wilson v. Corcoran, 562 U.S. 1, 5 (2010); Estelle v. McGuire, 502 U.S. 62, 67-68 (1991).

Title 28 U.S.C. § 2254(d) sets forth the following standards for granting federal habeas corpus relief:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

For purposes of applying § 2254(d)(1), "clearly established federal law" consists of holdings of the United States Supreme Court at the time of the last reasoned state court decision. Thompson v. Runnels, 705 F.3d 1089, 1096 (9th Cir. 2013) (citing Greene v. Fisher, 132 S. Ct. 38, 44-45 (2011)); Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011) (citing Williams v. Taylor, 529 U.S. 362, 412 (2000)). Circuit court precedent "may be persuasive in determining what law is clearly established and whether a state court applied that law unreasonably." Stanley, 633 F.3d at 859 (quoting Maxwell v. Roe, 606 F.3d 561, 567 (9th Cir. 2010)). However, circuit precedent may not be "used to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that th[e] [Supreme] Court has not announced." Marshall v. Rodgers, 133 S. Ct. 1446, 1450 (2013) (citing Parker v. Matthews, 132 S. Ct. 2148, 2155 (2012) (per curiam)). Nor may it be used to "determine whether a particular rule of law is so widely accepted among the Federal Circuits that it would, if presented to th[e] [Supreme] Court, be accepted as correct. Id. Further, where courts of appeals have diverged in their treatment of an issue, it cannot be said that there is "clearly established Federal law" governing that issue. Carey v. Musladin, 549 U.S. 70, 77 (2006).

A state court decision is "contrary to" clearly established federal law if it applies a rule contradicting a holding of the Supreme Court or reaches a result different from Supreme Court precedent on "materially indistinguishable" facts. Price v. Vincent, 538 U.S. 634, 640 (2003).

7

Under the "unreasonable application" clause of § 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case.[3] Lockyer v. Andrade, 538 U.S. 63, 75 (2003); Williams v. Taylor, 529 U.S. at 413; Chia v. Cambra, 360 F.3d 997, 1002 (9th Cir. 2004). In this regard, a federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Williams v. Taylor, 529 U.S. at 411. See also Schriro v. Landrigan, 550 U.S. 465, 473 (2007); Lockyer, 538 U.S. at 75 (it is "not enough that a federal habeas court, in its 'independent review of the legal question,' is left with a '"firm conviction"' that the state court was '"erroneous."'"). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 101 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)). Accordingly, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." Richter, 562 U.S. at 103.

If the state court's decision does not meet the criteria set forth in § 2254(d), a reviewing court must conduct a de novo review of a habeas petitioner's claims. Delgadillo v. Woodford, 527 F.3d 919, 925 (9th Cir. 2008); see also Frantz v. Hazey, 533 F.3d 724, 735 (9th Cir. 2008) (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because of § 2254(d)(1) error and that, if there is such error, we must decide the habeas petition by considering de novo the constitutional issues raised").

The court looks to the last reasoned state court decision as the basis for the state court

---

[3] Under § 2254(d)(2), a state court decision based on a factual determination is not to be overturned on factual grounds unless it is "objectively unreasonable in light of the evidence presented in the state court proceeding." Stanley, 633 F.3d at 859 (quoting Davis v. Woodford, 384 F.3d 628, 638 (9th Cir. 2004)).

judgment. Stanley, 633 F.3d at 859; Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004). If the last reasoned state court decision adopts or substantially incorporates the reasoning from a previous state court decision, this court may consider both decisions to ascertain the reasoning of the last decision. Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc). "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." Richter, 562 U.S. at 99. This presumption may be overcome by a showing "there is reason to think some other explanation for the state court's decision is more likely." Id. at 99-100 (citing Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991)). Similarly, when a state court decision on petitioner's claims rejects some claims but does not expressly address a federal claim, a federal habeas court must presume, subject to rebuttal, that the federal claim was adjudicated on the merits. Johnson v. Williams, 568 U.S. 289, 298 (2013) (citing Richter, 562 U.S. at 98). If a state court fails to adjudicate a component of the petitioner's federal claim, the component is reviewed de novo in federal court. Wiggins v. Smith, 539 U.S. 510, 534 (2003).

Where the state court reaches a decision on the merits but provides no reasoning to support its conclusion, a federal habeas court independently reviews the record to determine whether habeas corpus relief is available under § 2254(d). Stanley, 633 F.3d at 860; Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003). "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." Himes, 336 F.3d at 853. Where no reasoned decision is available, the habeas petitioner still has the burden of "showing there was no reasonable basis for the state court to deny relief." Richter, 562 U.S. at 98.

A summary denial is presumed to be a denial on the merits of the petitioner's claims. Stancle v. Clay, 692 F.3d 948, 957 & n.3 (9th Cir. 2012). While the federal court cannot analyze just what the state court did when it issued a summary denial, the federal court must review the state court record to determine whether there was any "reasonable basis for the state court to deny relief." Richter, 562 U.S. at 98. This court "must determine what arguments or theories . . . could

9

have supported the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." Id. at 101. The petitioner bears "the burden to demonstrate that 'there was no reasonable basis for the state court to deny relief.'" Walker v. Martel, 709 F.3d 925, 939 (9th Cir. 2013) (quoting Richter, 562 U.S. at 98).

When it is clear, however, that a state court has not reached the merits of a petitioner's claim, the deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a federal habeas court must review the claim de novo. Stanley, 633 F.3d at 860; Reynoso v. Giurbino, 462 F.3d 1099, 1109 (9th Cir. 2006).

V. Petitioner's Claim

Petitioner claims that the evidence is insufficient to support his conviction for the crime of torture, thus entitling him to habeas corpus relief in this court. (ECF No. 1 at 13-21.) Respondent contends petitioner is not entitled to relief because the state court's determination that the evidence was sufficient to support the conviction was not objectively unreasonable. (ECF No. 17 at 10-23.)

The last reasoned rejection of petitioner's first claim is the decision of the California Court of Appeal for the Third Appellate District on petitioner's direct appeal. The state court addressed this claim as follows:

> A. Substantial Evidence
>
> Defendant contends that his torture conviction must be reversed because the conviction is not supported by substantial evidence. We disagree.
>
> 1. Standard of Review
>
> "In reviewing a claim for sufficiency of the evidence, we must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime ... beyond a reasonable doubt. We review the entire record in the light most favorable to the judgment below to determine whether it discloses sufficient evidence—that is, evidence that is reasonable, credible, and of solid value—supporting the decision, and not whether the evidence proves guilt beyond a reasonable doubt. [Citation.] We neither reweigh the evidence nor reevaluate the credibility of witnesses. [Citation.] We presume in support of the judgment the existence of every fact the

10

jury reasonably could deduce from the evidence. [Citation.] If the circumstances reasonably justify the findings made by the trier of fact, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.]" (*People v. Jennings* (2010) 50 Cal.4th 616, 638–639.)

2. Torture Conviction

Section 206 defines the crime of torture as follows: "Every person who, with the intent to cause cruel or extreme pain and suffering for the purpose of revenge, extortion, persuasion, or for any sadistic purpose, inflicts great bodily injury as defined in Section 12022.7 upon the person of another, is guilty of torture. [¶] The crime of torture does not require any proof that the victim suffered pain."

"Thus, for purposes of section 206, torture has two elements: (1) the infliction of great bodily injury; and (2) the specific intent to cause cruel or extreme pain and suffering for the purpose of revenge, extortion, persuasion, or for any sadistic purpose. [Citation.] Torture focuses upon the mental state of the perpetrator. [Citation.] In this respect, revenge, extortion, and persuasion are self-explanatory. Sadistic purpose encompasses the common meaning, '"the infliction of pain on another person for the purpose of experiencing pleasure."' [Citation.]" (*People v. Massie* (2006) 142 Cal.App.4th 365, 370–371.) Black's Law Dictionary defines "revenge" as: "Vindictive retaliation against a perceived or actual wrongdoer; the infliction of punishment for the purpose of getting even." (Black's Law Dict. (10th ed. 2014) p. 1513.)

Defendant argues the evidence presented at trial was insufficient to establish that he had the requisite intent to cause "'cruel or extreme pain and suffering'" because he did not use a gun, knife or any other weapon during his assault on R.J. According to defendant, while R.J. "may have been seriously injured," she did not "suffer deep cuts," and her injuries "did not result in permanent scars or disfiguration of her face."

"Courts have interpreted intent to inflict 'cruel' pain and suffering as intent to inflict extreme or severe pain. [Citation.]" (*People v. Burton* (2006) 143 Cal.App.4th 447, 452.) However, it is not necessary that the defendant cause prolonged pain, or intend to do so. (*People v. Hamlin* (2009) 170 Cal.App.4th 1412, 1427.) The intent to torture is a state of mind which can be established by the defendant's own statements or the circumstances surrounding the commission of the offense. (*People v. Mungia* (2008) 44 Cal.4th 1101, 1137.) A jury may consider the severity of the victim's wounds in determining whether defendant intended to torture. (*People v. Mincey* (1992) 2 Cal.4th 408, 432–433.) "'[A] jury may [also] infer intent to cause extreme pain from a defendant who focuses his attack on a particularly vulnerable area, such as the face, rather than indiscriminately attacking the victim.' [Citation.]" (*People v. Hamlin, supra*, at pp. 1426–1427.) Intent can be reasonably inferred when the defendant "deliberately strikes his victim on an area of the body that is already injured." (*Id*. at p. 1430.)

11

> We conclude there is ample evidence in the record to support defendant's torture conviction. Viewing the evidence in the light most favorable to the prosecution, a reasonable jury could have concluded that defendant inflicted great bodily injury on R.J. with the intent to cause severe pain and suffering for the purpose of exacting revenge on R.J. because, he says, she stole from him. There is evidence defendant repeatedly punched, head-butted, and kicked R.J. over the course of several hours to teach her a lesson. There is also evidence defendant made R.J. keep her hands down while he repeatedly struck her in the face, and then made her get up off the floor so she could "face [him] like a man." The record discloses R.J. suffered numerous injuries, including a laceration on her forehead, swelling on her head, bruising on her arms, neck, ribs, and shoulders, and swelling and bruising on her entire face. R.J. testified that her face was so swollen from the attack that she could see her cheeks and eyelids. She described her face as unrecognizable, explaining that her face looked like "Freddy Krueger" and her head felt like it was made out of "Play–Doh." When defendant testified, he admitted that he was very angry and struck R.J. out of "revenge" because she stole from him. After his arrest, defendant said he "straight[ened]" R.J. out for stealing from him, and R.J. got what was coming to her and needed a whole lot more. Defendant also admitted he "beat on" R.J.
>
> We are not persuaded by the cases defendant relies upon to argue that torture requires more than the facts of this case demonstrate. The fact there are other cases in which the injuries suffered were more severe and the acts committed more horrific is irrelevant. "There is no question there are cases in which the acts of torture were more gruesome. However, '[w]hen we decide issues of sufficiency of evidence, comparison with other cases is of limited utility, since each case necessarily depends on its own facts.' [Citation.]" (*People v. Odom* (2016) 244 Cal.App.4th 237, 248.) The facts of this case amply support a finding of intent to torture.
>
> Contrary to defendant's contention, the crime of torture does not require the use of a gun, knife, or any other weapon. (*People v. Martinez* (2005) 125 Cal.App.4th 1035, 1044 ["the crime of torture does not require the use of any weapon"].) Nor, as defendant suggests, does the crime of torture require deep cuts or permanent scars or disfiguration. (*People v. Pre* (2004) 117 Cal.App.4th 413, 420 ["Section 206 does not require permanent, disabling, or disfiguring injuries; '[s]ection 206 only requires "great bodily injury as defined in Section 12022.7" .... "Abrasions, lacerations and bruising can constitute great bodily injury""'].)

(People v. Strawn, LD 1 at 8-12.)

## The Applicable Legal Standards

The Due Process Clause of the Fourteenth Amendment protects a criminal defendant from conviction "except upon proof beyond a reasonable doubt of every fact necessary to constitute the

12

crime with which he is charged." In re Winship, 397 U.S. 358, 364 (1970). Thus, one who alleges that the evidence introduced at trial was insufficient to support the jury's findings states a cognizable federal habeas claim. Herrera v. Collins, 506 U.S. 390, 401-02 (1993). Nevertheless, the petitioner "faces a heavy burden when challenging the sufficiency of the evidence used to obtain a state conviction on federal due process grounds." Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005). On direct review, a state court must determine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). Federal habeas relief is available only if the state court determination that the evidence was sufficient to support a conviction was an "objectively unreasonable" application of Jackson. Juan H., 408 F.3d at 1275 n.13.

Habeas claims based upon alleged insufficient evidence therefore "face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference." Coleman v. Johnson, 566 U.S. 650, 651 (2012) (per curiam). As noted by the Supreme Court:

> First, on direct appeal, "it is the responsibility of the jury−not the court−to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury." And second, on habeas review, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was 'objectively unreasonable.'"

Id. at 651 (citations omitted).

The Jackson standard "must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law." Jackson, 443 U.S. at 324 n.16. In performing a Jackson analysis, a jury's credibility determinations are "entitled to near-total deference." Bruce v. Terhune, 376 F.3d 950, 957 (9th Cir. 2004). When the factual record supports conflicting inferences, the federal court must presume that the trier of fact resolved the conflicts in favor of the prosecution and must defer to that resolution. Jackson, 443 U.S. at 326.

Under Jackson, this court's role is simply to determine whether there is any evidence, if accepted as credible by the trier of fact, sufficient to sustain conviction. Schlup v. Delo, 513 U.S. 298, 330 (1995). The United States Supreme Court has recently even further limited a federal

court's scope of review under Jackson, holding that "a reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury." Cavazos v. Smith, 565 U.S. 1 (2011) (per curiam). Jackson "makes clear that it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial." Id. at 2. Under Cavazos, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was 'objectively unreasonable.'" Id. at 2 (quoting Renico v. Lett, 559 U.S. 766, 773 (2010)).

California Penal Code section 206 provides as follows:

> Every person who, with the intent to cause cruel or extreme pain and suffering for the purpose of revenge, extortion, persuasion, or for any sadistic purpose, inflicts great bodily injury as defined in Section 12022.7 upon the person of another, is guilty of torture.
>
> The crime of torture does not require any proof that the victim suffered pain.

Analysis

The undersigned has reviewed the record and finds the state court's decision to be objectively reasonable. The evidence obtained at trial reveals the victim was beaten by petitioner, for a period of at least two hours, after she indicated an intent to, or in fact did, smoke some of petitioner's marijuana. The evidence is sufficient to establish petitioner inflicted great bodily injury with the intent to cause cruel or extreme pain and suffering for the purpose of revenge.

More specifically, the victim was struck in the head repeatedly even after being knocked down and commanded to get back up again. (RT 164-70, 218.) She was head-butted several times, kicked in the ribs, and struck with an open fist or palm by petitioner. (RT 166-68, 170, 218; see also 211-12 [cross examination].) The conduct endured for at least two hours. (RT 169-70.) At one point, petitioner told the victim to go get cleaned up; after she got out of the shower, he threw cups of cold water on her. (RT 171, 221.) Petitioner used crude language and made certain admissions during the assault. (See, e.g., RT 165 [petitioner told the victim he had a problem hitting women] & RT 166-67 [petitioner called the victim a "cunt" several times].) The victim's injuries included swelling, particularly of the eyes and cheeks, difficulty hearing,

bruising to her entire face, neck, arms and ribs. (RT 171, 176-77, 198.)[4] The victim did not know whether she lost consciousness during the assault, but thought so; she "was foggy," and felt like she "had a cauliflower stuck on top" of her head and her head felt like it was covered in "Play-Doh." (RT 168-69, 176.) When the victim was directed to look in the mirror by petitioner, she was afraid to do so. (RT 171, 177.) The victim described the image of herself as "unrecognizable;" she was reminded of the movie villain "Freddie Krueger." (RT 177, 198.)

In addition to the testimony of the victim, the jury saw photographs depicting the victim's injuries days after the incident. (RT 177-200.) The jury also heard evidence in the form of recorded phone calls between petitioner and his family members that were incriminating. (CT 68, 136-60.) Further, the jury heard from Shasta County Deputy Sheriff Greg Ketel that two days after the incident, he observed bruising and redness on the victim's face, particularly around her eyes and nose, and a laceration on her forehead; there was also bruising visible on the victim's back near her shoulders. (RT 235-36.)

The jury plainly credited the victim's testimony, as well as that of Deputy Ketel, over petitioner's testimony (RT 310-47). Those findings are "entitled to near-total deference" by a reviewing court. Bruce v. Terhune, 376 F.3d at 957.

Notably too, petitioner's trial testimony also tends to support the conviction when viewed in accordance with Jackson. Petitioner was "extremely upset" after waking from a nap to learn the victim and her friend Jennifer had taken "[o]ver an ounce" from a pound of marijuana in his possession. (RT 315-16.) Petitioner testified he yelled at the victim, "was very angry," and "slapped" "three or four times, rather hard across the face." (RT 317; see also RT 327.) Petitioner testified he did not remember pushing the victim to the floor, kicking or head-butting her. (RT 323-24.)[5] On cross-examination, when asked whether he had "slapped Robin for revenge because she was ripping [him] off," petitioner responded, "Yes, I did." (RT 338.)

As respondent correctly points out (ECF No. 17 at 22), a state court's interpretation of

---

[4] On cross examination, the victim testified she now gets headaches and sometimes dizziness as a result of the incident; she also has a loose tooth. (RT 218-19.)

[5] Petitioner later denied doing so.

state law is binding in this court. Bradshaw v. Richey, 546 U.S. 74, 76 (2005). Therefore, the state appellate court's holding that California law[6] does not require the use of weapons nor does it require a showing that the victim suffered deep cuts, permanent scars, or disfiguration, to support a torture conviction is binding here.

Petitioner did not meet his heavy burden here. Juan H., 408 F.3d at 1274. The state court's ruling was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." Richter, 562 U.S. at 103.

In this case, the state court's decision was not contrary to, or an unreasonable application of, clearly established Supreme Court authority. 28 U.S.C. § 2254(d); Coleman v. Johnson, 566 U.S. at 651; Cavazos v. Smith, 565 U.S. at 1-2; Jackson v. Virginia, 443 U.S. at 324-26. Therefore, the undersigned recommends petitioner's insufficiency of the evidence claim pertaining to his conviction for the crime of torture be denied.

## VI. Conclusion

Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." If petitioner files objections, he shall also address whether a certificate of appealability should issue and, if so, why and as to which issues. A certificate of appealability may issue under 28 U.S.C. § 2253 "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(3). Any response to the objections shall be filed and served within fourteen days after

---

[6] See People v. Martinez, 125 Cal.App.4th 1035, 1044 (2005); People v. Pre, 117 Cal.App.4th 413, 420 (2004); People v. Jung, 71 Cal.App.4th 1036, 1042 (1999). See also People v. Odom, 244 Cal.App.4th 237, 247 (2016).

16

service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

Dated: January 23, 2020

*[signature]*
KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

Straw2599.157